**MONTGOMERY WARD & CO., Incorporated, Plaintiff,**

v.

**The NORTHERN PACIFIC TERMINAL COMPANY OF OREGON, et al., Defendants.**

**Civ. A. No. 1686.**

United States District Court
D. Oregon.

April 29, 1954.

Wash., for Northern Pacific Terminal Co. of Oregon.

Charles A. Hart, Portland, Or., Clark A. Eckart, Seattle, Wash., for Great Northern Railway Co.

Charles A. Hart, Fletcher Rockwood, Portland, Or., Dean H. Eastman, Clark A. Eckart, for Spokane, Portland & Seattle Ry. Co.

Charles A. Hart, Portland, Or., Dean H. Eastman, Seattle, Wash., for Northern Pac. Ry. Co.

Roy F. Shields, Joseph G. Berkshire, Portland, Or., for Union Pac. Ry. Co.

Clarence J. Young, Portland, Or., for Southern Pac. Co.

Borden Wood, Grant T. Anderson, Portland, Or., for Railway Express Agency.

John M. Hickson, Portland, Or., for F. D. Hartwick and others.

C. O. Fenlason, Portland, Or., for Gustav Robertson.

William P. Ellis, Portland, Or., for Albert C. Pounder and others.

Leonard D. Alley, Portland, Or., for Emil Jossy, and others.

C. E. Holbrook and Donald A. Schafer, Portland, Or., for Consolidated Freightways, Inc.

**JAMES ALGER FEE, Chief Judge.**

The decision of this Court heretofore filed [1] has been subject to much misinterpretation.

The opinion, reduced to its lowest terms, held that each common carrier, whether trucker or railroad, has a duty at common law and under the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., to receive, transport and deliver goods in accordance with its holding out or the engagement of its posted tariff.[2] This duty is almost absolute,[3] since the car-

Stuart S. Ball, John A. Barr, David L. Dickson, William L. Niemann, Chicago, Ill., and Stephen Parker, Portland, Or., for Montgomery Ward & Co.

Roy F. Shields, Joseph Berkshire, Portland, Or., Dean H. Eastman, Seattle,

---

1. See the opinion on liability, Montgomery Ward & Co., Inc. v. Northern Pacific Terminal Company of Oregon, 128 F. Supp. 475.

2. "Each held itself out as prepared (1) to transport in commerce goods described in its tariff * * * (2) to accept, re- ceive and transport * * * such goods from such plant * * *, and (3) to deliver to consignee, at said plant * * *." 128 F.Supp. 503.

3. There have been abortive attempts to distinguish Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Railway Co.,

rier is excused only if performance is prevented by the act of God or the public enemy. Because neither of these defenses was established, liability was found as to each defendant as to specific goods.[4]

■ By choosing the theory outlined in the pre-trial order and in the opinion on liability, Wards escaped all other defenses such as (a) that the action was for delay, (b) that receipt, delivery and transportation were affected by Wards' strike, and (c) defenses which might have been urged if Wards had sought to hold the carriers, their employees and the outside labor unions as participants in an over-all conspiracy under the Anti-Trust Act or at common law.

First, action for delay of goods in transit was definitely repudiated. Delay was found as a fact, but it was caused by the refusal of the defendants to perform the primary duty. The circumstances of the reasonableness of the delay were therefore not pertinent as a defense. It is true the Court found there was no basis in fact for a finding that any carrier used reasonable care to deliver without delay.[5] Thus the action could have been sustained if that ground had been chosen.[6]

■ Second, this choice also eliminates all apparent defenses based upon labor conditions. It is true a strike of the employees of any carrier continued through the period might have been a defense for that defendant. But the facts show that the Court was not dealing with a strike, walkout or lockout of the employees of the carriers themselves. Under such circumstances, each carrier is bound by the acts and omissions of each of its own employees in line of duty and on the business of the carrier.[7] So long as the employees were so acting, each was bound by the public obligations

D.C., 105 F.Supp. 794, from the opinion on liability in the instant case, on the ground that the Minnesota court required a showing of due diligence only on the part of the carrier. Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Railway Co. is a case concerning the furnishing of cars. It was held that the railroad company was not relieved of this duty because there was a strike at the plant of its shipper. "It is recognized, of course, that this duty is not absolute * * *." Page 799. "The undeniable fact is that the railroad company took no affirmative steps whatsoever to comply with its duty as a common carrier, and did nothing to insist and demand that the strikers should not interfere with the performance of that duty. * * * Instead of attempting to obey the law of the land, the defendant assumed to consider the wishes and the demands of the striking Union as being paramount. To condone defendant's failure to perform its statutory duty under this evidence would be tantamount to recognition that mob rule had supplanted law and order in this community." Page 802. This shows that these cases stand on the same ground and arrive at the same result. Another recent decision, Erie Railroad Co. v. Local 1286, International Longshoremen's Association, D.C., 117 F.Supp. 157, applies similar logic to a suit by a carrier to enjoin union activity which interfered with its performance of its common law duties.

4. "The Court expressly finds that each of the carrier defendants failed and refused, as to some shipments, to perform at least one of the obligations of the 'holding out' above set forth." 128 F. Supp. 503. The carrier defendants against whom such liability was established are listed at the end of this opinion.

5. "Because of their adherence to the combination *. * * the carriers did not use reasonable means or any means at all to carry out their duties." 128 F. Supp. 514.

6. Ritchie v. Oregon Short Line Railroad Co., 42 Idaho 193, 244 P. 580, 45 A.L.R. 909, which holds that a strike of carrier employees may be considered in determining whether a *delay in delivery* is unreasonable, is not here in point. See also Gage v. Arkansas Cent. R. Co., 160 Ark. 402, 254 S.W. 665, and Murphy Hardware Co. v. Southern Railway Co., 150 N.C. 703, 64 S.E. 873, 22 L.R.A., N.S., 1200, which deal with delays in receiving freight for transportation, caused by strikes of carrier employees.

7. "The acts of transportation employees, both rail and motor, in the course of employment, even in repudiation of the basic obligations of the carrier, are the acts and omissions of the employer." 128 F. Supp. 500.

of the carrier which he served. The employee could not disregard these and act as a private citizen so long as he went about the business of the carrier in this public employment.[8]

Third, Wards distinctly repudiated, as a ground of recovery, conspiracy either at common law or under the Anti-Trust Act. In the pre-trial order and the briefs, this position is clear. The Court found evidences of collusion and cooperation between the carriers, their employees and outsiders, but this was considered only to determine that the defenses alleged were impertinent to Wards' chosen cause of action.[9]

Wards' theory of liability—that each defendant failed and refused to receive, transport and deliver goods in accordance with its holding out—had the effect of negativing all defenses of the carriers.[10] Wards chose this theory wisely in order to obtain a conclusion of liability as to each carrier defendant. The conspiracy which the Court found in negativing such defense was given no play in plumbing for the foundations of recovery. Such conspiracy serves merely to emphasize the fact that the repudiation of its duty was a voluntary and willful act on the part of each carrier.

Wards now seeks to disregard the specific theory upon which it obtained adjudication of liability. Its purpose in this repudiation is to obtain judgment against all carriers, jointly and severally, for all alleged losses, including diminished business, escaped profits, and increased costs from the day the strike at its plant began until the pickets were withdrawn.

This divergence between Wards' theories of liability and of damage clearly appears in the pleadings and pre-trial order[11]. It was commented upon by the Court before the pre-trial order was signed. It was obvious then, as it is obvious now, that Wards' damage items were not segregated in such manner as to be pertinent to particular carriers if several judgments against each rather than a joint judgment were obtained.[12] Insofar as this factor prevents the assessment of actual damages sustained,·

8. Even in dealing with a business not touched with a public interest, it is held that an employee is not privileged to refuse to cross a picket line in the course of his employment. National Labor Relations Board v. Rockaway News Supply Co., Inc., 2 Cir., 197 F.2d 111, affirmed on other grounds 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832. This is not to say that picketing which is otherwise lawful is rendered illegal because employees of a neutral employer refuse to cross the picket line. National Labor Relations Board v. Service Trade Chauffeurs, 2 Cir., 191 F.2d 65.

Set up as one defense here is the fact that certain carriers during the strike contracted with their employees, or the union to which the latter belonged, that these employees would not be required to pass through a picket line maintained by an A. F. of L. union. Such a contract violates the common law and the Interstate Commerce Act. It is an illegal provision, void and of no effect. Notwithstanding the execution of the contract, the carrier could have been compelled by mandamus to perform its duties. Best Motor Lines v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen

& Helpers of America, Local No. 745, 150 Tex. 95, 237 S.W.2d 589. Entry into a contract containing such a clause is a violation of its franchise whereby the carrier might well be stripped of its character as a common carrier by proceedings of the sovereign.

9. "A concert of action between carriers, such as there was here, to discriminate against a single shipper, is action in restraint of trade. * * * this action in concert deprived the carriers of all defenses. For defendants could not urge that action in which each had a part was an excuse for failure to transport." 128 F.Supp. 509.

10. As pointed out above, defendants did not establish an act of God or the public enemy as a defense; neither were bill-of-lading defenses established, as the opinion on liability indicates.

11. See the opinion approving the pre-trial order in this case, D.C., 128 F.Supp. 489.

12. Nor are Wards' items of damage segregated so as to be pertinent to joint judgments against groups of defendants,· as is pointed· out below.

the fault is Wards'. There is this much to be said in explanation: Wards was attempting to get its plant reopened on a full time basis during the boycott rather than segregating damage for this lawsuit.

Wards' proof relates almost exclusively to bulk damages which might have been recovered if, as a condition precedent, it had been pleaded, either in the formal documents or by including the theory in the pre-trial order, that there was a conspiracy in which not only the defendants had joined but also the government agents and Wards' own striking employees. If such were so pleaded, it could not have been proved, since all parties agreed and the Court has held that the local union and Wards' employees were engaged in lawful acts when they struck and set up a peaceful picket line.[13] This pointedly designates the necessity which binds Wards to the theories of law and fact to which, in open court, it agreed before trial.

■■ It is objected that the Federal Rules of Civil Procedure, 28 U.S.C.A., do not require the statement of a cause of action, and therefore plaintiff is not bound by his theory of the case. If this position is sound, court proceedings are reduced to irrationality. In any event, this Court directed that a pre-trial conference be held here to "simplify the issues." The definitive order, heretofore entered, crystalized the contentions of law and fact, and the simplified issues were based thereon. The pre-trial order was adopted to prevent appellate courts from writing essays about theories of law and circumstances of fact not involved in the case. The order is not only binding on the higher courts, but is also binding upon this Court and the parties, and specifically upon plaintiff.[14]

Since the Court has outlined the limitations upon the power to award damages based upon the theories of liability chosen by Wards, it will now be indicated the manner in which the Court will make the assessment. The Court will exercise the prerogatives of a jury and fix damages in gross as against each defendant, but without analysis of particular items. However, it may be well to define certain areas of exclusion.

■ Even if we refuse to consider the strike of Wards' employees in determining that the carriers were bound to receive, transport and deliver—as we must if the country is to run—the effect thereof on the volume of business, profits and expenses is marked. These consequences were the very purpose of this strike, which was legal and justifiable. Had the carriers done no unlawful acts of boycott, these damages would have been caused. For such damage, no carrier is responsible.

Until December 25, 1940, notwithstanding the strike of Wards' employees, the rail carriers picked up, transported through the Portland area and delivered goods to Wards' plant, by extra efforts. No damage is shown to Wards by the act of any carrier before that date, since it is unquestioned that the rail carriers carried everything which was offered either to or from the plant.[15]

■ The plant was closed by Wards on May 3, 1941. This action was the re-

13. " *  *  * the National Labor Relations Board decided that Wards had been guilty of unfair labor practices as to its own employees *  *  *." 128 F.Supp. 489.

14. "When a plaintiff has by his counsel advised the Court and defendant of the theories upon which he relies and has given account of these, then the Court should not adopt some other theory of recovery, even if it should be believed that such a theory was more applicable." Clark v. United States, D.C., 13 F.R.D. 342, 345.

"An admission [as to theory of liability] by counsel in open court made part of the judicial record and used as a foundation for a judgment, is the most solemn and binding act. No matter what the circumstances were the fact admitted of record binds the parties and the privies." King v. Edward Hines Lumber Co., D.C., 68 F.Supp. 1019, 1021.

15. Except some shipments destined for Wards in the hands of the motor carriers.

sult of the arbitrary and unwarranted interference of the government in private affairs. The post office, on April 26, 1941, had placed a limit on the amount of parcel post which would be handled into the plant. No words can express the disapproval of the Court with regard to this action. Under a representative government, it was unforgivable. However, the Court cannot assess damages a'gainst private parties for consequences of the act of the government then in power.

December 25, 1940, on one side, and May 3, 1941, on the other, set the limit of the damages.

■ We should take our start from what Wards proved as to each defendant. It is established by explicit proof that most of the defendants had shipments in their hands which each failed to transport and deliver in accordance with its obligation. Further, the Court knows from the record that Wards was damaged by the refusal of each individual carrier to attempt to pick up and receive goods from Wards. But Wards' issues as to damages do not suggest segregation into those caused by a particular carrier to pick up, receive, transport in the local area or to deliver at the plant a particular shipment or a designated lot of goods. There is no tracing of any particular shipment showing origin, cost, shipping charges, expected profits and handling charges, incidental other damages including the fact that once in the shipment could not be sent out, and the subsequent history of the shipment.[16] Facts such as these

would be the only proper basis for computing damages on Wards' theory.[17]

■ Each item of property in the hands of any defendant was eventually delivered to Wards either at its Portland plant or, after transshipment, at some other point.[18] It appears immediately that the eventual delivery establishes a certain mitigation of damages, the extent depending on circumstances. In this connection, certain defendants gave Wards facilities for packaging, remarking and transshipment of goods. As to each defendant, such elements should be considered.

■ The Court awards no damages against Railway Express Company, based upon the fact that it took no active part in the conspiracy and minimized damages by every means within its power, and assisted Wards in many ways. The Court is of the opinion that Railway Express more than wiped out any damage caused by a violation of its primary obligation by its help beyond its duty.

■ As to incoming freight, joint liability[19] was established against Northern Pacific Terminal Company and each of the rail carrier defendants, for the failure of each to effect delivery of freight at Wards' Portland establishment. Although responsible for the nondelivery of a large amount of freight, including less-than-carload rail freight, Robertson was not sued by Wards in its capacity as a local handler of pick-up and delivery, and Wards is bound by this exclusion.

---

16. For example, a number of shipments consigned to Wards, the ultimate destinations of which were retail stores in the Northwest, were reconsigned and delivered to such retail stores during the strike period. Little or no damage could be predicated upon such shipments.

17. Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Railway Co., D.C., 105 F.Supp. 794, 805–807.

18. With the exception of some lost or damaged shipments for which settlement

has long since been made between the parties.

19. "The refusals, failures, denials and repudiation were made by each line carrier through its agent, Robertson or Terminal Company". 128 F.Supp. 503. See also footnote 48 at page 503. "An agent who does an act otherwise a tort is not relieved of liability by the fact that he acted at the command of or on account of the principal * * *." II Restatement of the Law of Agency § 343. See IV Restatement of the Law of Torts §§ 875 et seq.

If we turn to the outgoing shipments, there is found no joint liability except in one instance. Robertson could have been held jointly with certain line-haul motor carriers if Wards had not disclaimed as to him. The Northern Pacific Terminal Company is liable jointly with each of the line rail carriers for damages caused by the failure to pick up and transport outgoing shipments. In this connection, the question of tender by Wards to each of the defendants is pertinent. With the exception of a certain group of items [20] it appears that there was no specific tender to any carrier. As to items in this group, the elements of damage to non-delivered shipments, indicated above, were pertinent but not proved. Wards posits responsibility of each carrier individually for the entire damage caused by the failure of all to take outgoing shipments. The Court only assesses those which can be shown as to shipments tendered to a particular carrier and, within closely circumscribed limits, damages for the refusal of a particular carrier to receive goods at Wards' plant generally.

The Court now proceeds to the assessment of damages.

The first column of the schedule below represents the findings of the Court as to general damages, assessed against each defendant as a jury might assess it by verdict. These figures include all elements of actual damage and loss proved to have been proximately caused by the particular defendant, taking into consideration any matters which tend to minimize or reduce damages.

In the second column, the Court assesses punitive damages. The elements which require these awards, together with the factors which tend to increase or diminish the amount assessed against an individual defendant, are set out in the opinion on the merits.

There is, however, one feature still to be considered in the allocation of punitive damages. The Teamsters Union had as its members all those employed by the motor carriers. It seems reasonable to believe that the defendant motor carriers could have prevented damage to Wards by standing a strike upon their own lines. Such a strike, with boycott objectives which tied up motor transportation in the local area, would have been not only illegal, but also highly unpopular. Probable duration would have been short. In the meantime, as the motor carriers knew, the railroads would have done all the hauling to and from Wards, as they did during most of December, and the motor carriers might have become insolvent by attrition. On the other hand, if such a strike occurred on the line of any motor carrier, it would not have been liable to Wards for failure to perform its common law obligations.[21]

As to the motor carriers, the Court finds it was an implied if not express condition of their acceptance of the boycott that members of the motor carrier unions would attempt to force the railroads to cease service also.

However, the railroads were reprehensible also because their employees had no excuse whatsoever to strike, and the provisions of the Railway Labor Act would have protected these carriers against such a threat.[22]

The uneasy cooperation of these strange bedfellows in their defense against Wards' claims was a marked feature of this case, and led to undue extension of time in drawing the issues. But each carrier of either class acted in a manner inimical to the public interest

---

20. Originally tendered to certain motor carrier defendants, but received and transported by Northern Pacific Terminal Company before December 25, 1940.

21. However, "If a strike of their own employees occurred, they would still be under obligation to use all means within their power to attempt to receive, transport and deliver to Wards." 128 F.Supp. 517.

22. The Railway Labor Act, 45 U.S.C.A. § 151 et seq., provides orderly procedures for the settlement of disputes between carriers and their employees.

and without regard to the damage caused others by violation of its peculiar obligations for purely selfish motives. This is a definition of malice and must be covered by an award of punitive damages. Since the Court has observed that such a situation will not likely recur and since the Court does not wish to compensate Wards for a breach in its own labor relations, such punitive damages will only mark the reproof, rather than be imposed in a sum adequate to the enormity of the offense which the Court finds as to each carrier.

If the Court were to follow an Oriental theory of distribution of judicial favor, a large award might be made. Some notable practitioners and writers in an allied field seem to advocate this procedure. The Court feels that Wards has been grievously injured and inclines morally toward ample compensation. But the law and Wards' theory of liability impose limitations, which are reflected in the schedule of damages below.

(Here follows in the opinion a schedule of actual and punitive damages awarded against 34 defendants.)